UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


ALBERT MYLES,

               Petitioner,

vs.                                        Case No. 3:06-cv-33-J-12TEM

JAMES R. MCDONOUGH,[1] et al.,

               Respondents.

_____

**ORDER**

**I. Status**

     Petitioner, an inmate of the Florida penal system who is represented by James T. Miller, Esquire, initiated this action by filing a Petition (Doc. #1) for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on January 12, 2006.  He challenges his June 22, 2001, state court (Putnam County) conviction for manslaughter.  He contends that he received ineffective assistance of counsel for counsel's failure to: (1) cross-examine and produce evidence of bias of the state's witnesses against the Petitioner; (2) impeach Addie Hodges, one of the state's witnesses; and, (3) call witnesses on behalf of the Petitioner at trial.

_____

    [1] James R. McDonough, the Secretary of the Florida Department of Corrections, is substituted as the proper party Respondent for James V. Crosby, Jr., pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

On February 27, 2006, Respondents filed their Response to Petition (Doc. #7) (hereinafter Response). Petitioner has replied. See Petitioner's Reply to Response to Petition (Doc. #11) (hereinafter Reply), filed March 20, 2006. Thus, this case is now ripe for review.

## II. State Court Procedural History

On January 18, 2000, Petitioner was charged by information with one count of second degree murder. App.[2] A at 16. After a trial by jury, Petitioner was found guilty of manslaughter. Id. at 162. On June 22, 2001, the trial court adjudicated Petitioner guilty of this offense and sentenced him to fifteen years of imprisonment. Id. at 172-79.

On direct appeal, Petitioner argued that the evidence was insufficient to sustain his conviction. App. D. Appellate counsel thoroughly summarized the statement of the case and the facts as follows:

> The events surrounding this case occurred during the early morning hours of December 26, 1999 in the parking lot of an establishment aptly named Club Chaos in Palatka, Florida. [R1-1] On that date a series of brawls broke out between two sets of relatives, the Myles family and the Singleton family. Those participating in the fight were Anthony "Amp" Clark, Freddie Jenkins, and Appellant Albert "Bay Bay" Myles for the Myles family and Carlos Singleton, Jamie Allen, and Ronald "Panda" Garvin for the Singleton family.

---

[2] The Court hereinafter refers to the three-volume Appendix (Doc. #8, Doc. #9 and Doc. #10) as "App."

Following the melee, Carlos Singleton was dead and Jamie Allen was injured, both from stab wounds. [R3-138; R5-14] Over the next three days Albert Myles, Jr. was arrested for committing both crimes. [Rl-5; Rl-21-25]

Mr. Myles was initially arrested on the date of the incident for the aggravated battery of Jamie Allen. The following day, December 27, an arrest warrant for Mr. Myles was issued. [R1-2] The warrant and affidavit that accompanied it indicated that Mr. Myles was wanted for the second degree murder of Carlos Singleton on December 26. [R1-5-6] Mr. Myles was arrested on the second degree murder charge on December 29, 1999. [R1-5] An information accusing him of the second degree murder of Carlos Singleton, in violation of Fla. Stat. § 782.04(2), was filed on January 19, 2000. [Rl-16] The information specified that Mr. Myles murdered Mr. Singleton by stabbing him. The aggravated battery charge relating to the stabbing of Jamie Allen was never filed.

On May 22, 2001, Mr. Myles' trial counsel filed a motion in limine [Rl-125] which sought to exclude evidence of the stabbing of Jamie Allen. He argued, in essence, that the prejudicial effect of such evidence outweighed its probative value because of the potential for the jury to lump the two stabbings together and convict Mr. Myles of killing Mr. Singleton even though they could believe that the evidence fell short as to Singleton but that he had stabbed Jamie Allen. He also argued that the State had not provided notice under the *Williams*[3] rule of its intent to elicit testimony regarding Jamie Allen's stabbing. The State responded by arguing that the two events were inextricably intertwined. [R3-3-11] The court denied the defendant's motion. [R3-12-13]

---

[3] <u>Williams v. State</u>, 110 So.2d 654 (Fla. 1959).

Mr. Myles' trial started on May 23, 2001. [R3-14]   The State called a total of eight witnesses, four of whom claimed to see some or all of the events surrounding the stabbings of Carlos Singleton and Jamie Allen.   The other State witnesses were three police officers and the medical examiner.

On December 26, 1999, Christmas night revelers filled the parking lot of Club Chaos. [R3-48; R3-79; R4-238; R5-24; R5-78]   Kelvin Willis, who was 20 years old at the time of the trial, testified that he observed the pertinent events from the passenger seat of a car parked in the lot.  [R3-48]  After sitting in the car for about half an hour, Mr. Willis saw a fight break out - Freddie Jenkins and Amp Clark versus Jamie Allen and Carlos Singleton.    [R3-76-78]    After about two minutes, shots rang out and everyone scattered.   [R3-78]   Then Mr. Willis heard some unknown person yell, "Go get Bay Bay," [R3-82] at which time he saw Albert Myles walking across the street.   [R3-83]   Mr. Willis did not see a knife, or any other object, in Mr. Myles' hand [R3-55], but it appeared like he was trying to hide something. [R3-84-86]   Once across the street[,] Mr. Myles came into contact with Carlos Singleton. [R3-55]   With Mr. Myles' back to Mr. Willis and Mr. Singleton facing him [R3-89], Mr. Willis observed Mr. Myles strike Mr. Singleton. During his testimony, Mr. Willis at first characterized the contact as a stab [R3-56-57], but then qualified it by indicating that it was a stabbing motion, rather than a stab, in view of the fact that he did not see a knife.  [R-56; R-89]  He then admitted that the motion he observed may have been no more than a punch.  [R3-89]  In any case, it was an underhand motion, one time, and Mr. Willis was unsure as to whether Mr. Myles used his left or right hand.  [R3-88-89]

At that point, according to Mr. Willis, Amp Clark and Freddie Jenkins joined the fray. Clark and Jenkins dragged Singleton between two cars and attacked him by picking him up

and slamming him down on the ground.  [R3-89-91]  As for Mr. Myles' role at this point, Mr. Willis related four inconsistent versions, as follows:

Version one:

Q:  Okay.  And what happened when Freddie Jenkins and Amp got there?

A:  They grabbed him between some cars, between two cars and started beating him up and stuff.

Q:  Okay.  Did you see any more stabbing motions?

A:  Yes.  But I couldn't tell if he was stabbing him or not.

Q:  At some time, did you see a knife in Bay Bay's hand?

A:  Yes, I saw like the reflection of it and stuff.

Q:  The reflection of the silver part of the knife?

A:  Yes.

Q:  And when was that that you saw that?  When during this event did you see the reflection of the knife?

A:  When they were between the cars.

Q:  When they were between the cars?  Was his hand coming up?

A:  No, the hand motion (indicating).

Q:  A hand motion like that?

A:  Yeah.

5

Q:   Going towards Carlos' body?

A:   Uh-huh.

Q:   Now do you remember about how big the knife was, the blade part?

A:   I really couldn't tell, but probably like six or five inches.

[R3-56-57]

Version two:

Q:   All right.   All right, sir. Now, Freddie and Amp drag Carlos to that location, and you said that Mr. Myles just kind of walked along or beside or behind; is that right?

A:   Yes.

Q:   And once they got over there, you saw Freddie and Amp picking up Carlos and slamming him down?

A:   Yes.

Q:   You said you didn't see them kicking him, though?

A:   No.

Q:   And because the cars were there, did you ever see Albert Myles stab Carlos Singleton after Carlos Singleton got to position Number 4?

A:   I seen a stabbing motion.

Q:   All right.  Show me that motion again.

A:   (Indicating.)

Q:   Stand up for us so we can see so we're not - see, the jury is kind

of seated down, so it's hard for them to see.

A:  (Indicating.)

Q:  I see, underhanded.  And you used your right hand that time.  Did you mean to use your right hand?

A:  No.

Q:  Are you sure which hand Mr. Myles used?

A:  No.

Q:  **Are you sure there was a knife in his hand at that time?**

A:  **No.**

Q:  All right, sir.  But you saw a motion?

A:  Yes.

Q:  Could have been a stabbing motion?  Could have been a punching motion?

A:  Yes.

[R3-93-94] [Emphasis supplied]

Version three:

Q:  Two people were picking Carlos up at the same time?

A:  Yeah.

Q:  And who were those two people who were picking him up?

A:  Amp Clark and Freddie Jenkins.

Q:  What was Albert Myles, the defendant, doing at that time?

7

A:   Standing up.

Q:   Albert was standing up?

A:   Yeah.

Q:   Was he just standing there watching or was he doing anything?

A:   Just standing and watching.

[R3-60-61]

Version four:

Q:   I asked you, after he had gotten stabbed how did he get in between the cars?

A:   Amp Clark and Freddie Jenkins drug him between the cars.

Q:   What was the defendant doing at that time?

A:   Fighting behind him.

[R3-62-63]

In any event, Jamie Allen arrived on the scene a short time later.  According to Mr. Willis[,] Mr. Myles turned around and stabbed Jamie Allen - who appeared to be empty-handed - and Allen fell to the ground.  [R3-58]  At that point Albert Myles, Amp Clark, and Freddie Jenkins got in their cars - which were parked across the street - and left.  [R3-63]

Like Mr. Willis, witness Travia Fuller was out on the town that night and noticed a fight pitting members of the Myles family against members of the Singleton family.  Ms. Fuller, who at the time of the trial was a 21 year old fast food employee [R4-218], was sure of the identities of at least three of the combatants, Carlos Singleton, Freddie Jenkins, and Amp Clark.  As for the fourth, she assumed it was Jamie Allen, but could only say for

8

sure that it was one of Carlos' brothers.
[R4-221]

Ms. Fuller was in a vehicle, parked
across from Club Chaos when the fight started.
During the approximately five or ten minute
duration of the fracas she got out of the car,
but ran back in when she heard gunshots. [R4-
220-222; R4-249-252]  Ms. Fuller put the car
seat back, and when she came back up a couple
of minutes later she observed Amp Clark and
Freddie Jenkins dragging Carlos Singleton in
between some vehicles by his hair, at which
time they started kicking him. [R4-223; R4-
255-257]  Mr. Jenkins then ran to the edge of
the road and called Mr. Myles, who was across
the street in the parking lot of China Buffet.
[R4-223; R4-263]  Mr. Myles ran across the
street and when he got to the Chaos side Ms.
Fuller saw a four to five inch knife in his
hand. [R4-224]  Mr. Myles proceeded to the
area between the cars where Mr. Singleton and
Mr. Clark were "locked up." [R4-225; R4-232]
Mr. Myles then engaged in what Ms. Fuller
characterized as a stabbing motion, at least
five times, directed at Mr. Singleton. [R4-
225; R4-265]  She did not, however, see a
knife in Mr. Myles' hand at that point. [R4-
268]  Mr. Singleton fell to the ground and Mr.
Clark and Mr. Jenkins continued to kick him.
[R4-227]

Then Jamie Allen, carrying a brick in his
hand, came on the scene. [R4-228; R4-272]
According to Ms. Fuller[,] Mr. Myles turned
towards Mr. Allen but she did not see what
happened.  Mr. Allen slid to the ground in the
vicinity of his brother. [R4-230]

Mr. Allen, who at the time of the trial
was a 22 year old tractor driver for a local
farm, supplied the court with his version of
the events of December 26, 1999. [R5-5]
According to Mr. Allen, it was Carlos
Singleton and Ronald "Panda" Garvin who were
involved in the initial fight with Freddie
Jenkins and Amp Clark. [R5-8]  More
specifically, Garvin was fighting with Clark

9

and Singleton was opposing Jenkins.  [R5-9] Aware that Jenkins had a size advantage over Singleton, Allen decided to help Carlos.  [R5-9]  Mr. Allen described the intensity of the brawl at that point as follows:

> Q:  Okay. So what happened when you got over there to help him?
>
> A:  We started fighting, and then when Freddie was down - well, he told us to stop.  We was about to kill him, so we stopped, right. Then we jumped on Amp, and then, by that time, the guy shot the gun and broke it all up and everybody scattered.
>
> Q:  How many people were fighting Amp, when you say you jumped on Amp?
>
> A:  All three of us.
>
> Q:  You and Carlos and Panda?
>
> A:  Yes, sir.

[R5-9-10]

The gunshot, according to Mr. Allen, put a temporary end to the violence.  He ran back to his truck, which was still running, and put it in gear, but then noticed that the fight had resumed.  [R5-10; R5-29]  Now Amp Clark and Albert Myles were brawling with Carlos Singleton.  [R5-31]  Though restrained momentarily by some unknown person [R5-30], Mr. Allen broke free and headed over to Carlos.  [R5-32]  On the way he passed Mr. Myles, who was heading in the opposite direction, at which time Mr. Myles stated, "You're one of those niggers that was fighting my brother, too."  [R5-10; R5-33]  Mr. Allen continued to where Mr. Singleton was laying [sic] on the ground and knelt to tend to him. [R5-10; R5-34]  The events that followed are best described by Mr. Allen:

10

And by the time I got over there and kneeled down to see what was wrong with my brother, Albert rushed out in the front, and somebody hit me from the back of my head. And I thought I was losing breath because I was fighting, and they started kicking us and stuff. I know Albert was one of them, and, I believe, Amp. But they started kicking us, and I laid on top of my brother, and by that time the police had come.

[R5-10-11]

Mr. Allen, who had been stabbed once in the area of the chest, did not realize he had been wounded until the police cut his clothes off. [R5-35] He never saw Albert Myles in possession of a knife. [R5-35] As for his own possession of a brick, Mr. Allen admitted that he had a brick in his hand during the initial fight but denied having it when he went over to where Mr. Singleton was on the ground. [R5-37-38]

The last witness called by the State was Addie Pearl Hodges, who at the time of the trial was a 22 year old nursing assistant at Flagler Hospital. [R5-45] On the night of the incident Ms. Hodges, while sitting in her car in the Club Chaos parking lot, noticed a three-on-one fight - Singleton, Garvin, and Allen versus Clark. [R5-48-50] As the battle progressed Ms. Hodges heard a voice call out, "Go get Bay Bay," at which time Mr. Myles quickly appeared and ran through the crowd in a determined manner, "his hands up like he was just fixing to start swinging." [R5-51-54; R5-66] Ms. Hodges did not see a knife in Mr. Myles' hands. [R5-53-54; R5-66]

At that point[,] Ms. Hodges heard gunshots. [R5-53; R5-66] Her reaction was to run to the first car she saw, dive down beside it and hide. [R5-53; R5-67] After some time, when she peeked back up[,] she saw Mr. Myles

11

and Mr. Clark between some cars kicking and
stomping Mr. Singleton. [R5-55; R5-68-69]
Jamie Allen, brick in hand, then entered the
scene. [R5-55; R5-70] Mr. Myles and Mr. Clark
met up with Mr. Allen, and then a flip knife
was produced by Mr. Myles. Mr. Myles
proceeded to stab Mr. Allen a few times. [R5-
56; R5-71-74] A deep unknown man's voice
announced the imminent arrival of the police,
at which time Mr. Myles and Mr. Clark took off
running. [R5-57; R5-74] Jamie then laid down
next to Carlos and the police got there
seconds later. [R5-57; R5-75]

Following Ms. Hodges' testimony and the
State's announcement that it rested, Mr.
Myles' trial counsel moved for a judgment of
acquittal "as to the charge in its entirety,"
[R5-84], or failing that, as to the element of
second degree murder requiring proof that the
defendant "committed an act that was
imminently dangerous to another or evincing a
depraved mind regardless of human life." [R5-
85] In arguing for a directed verdict[,]
counsel cited the fact that there were no
witnesses who testified that they actually saw
Albert Myles stab Carlos Singleton with a
knife. [R5-84-85] The court denied the
motion [R5-86] and the defense's case
commenced. [R5-90]

Ronald "Panda" Garvin was the defense's
only civilian[4] witness. According to Mr.
Garvin, the fight between the two families on
December 26, 1999 was precipitated by an
incident that occurred the month before, on
Thanksgiving. At that time Mr. Myles was seen
out with a woman other than his girlfriend,
Roselyn Singleton, a Singleton family
relative, causing a fight to erupt between Mr.
Garvin and Amp Clark, Albert Myles, and two
Myles family cousins. Mr. Garvin was beat[en]
up that night by Amp Clark. [R5-113; R5-122]

---

[4] Defense counsel also called three police officers, who
testified regarding the evidence that was recovered from the crime
scene and the preservation of the crime scene.

On Christmas night[,] Mr. Garvin, Mr. Singleton, and Mr. Allen were out together. [R5-108]   After leaving another club they traveled to the parking lot by Club Chaos, and Mr. Allen went his own way.  [R5-108-112]  Mr. Garvin and Mr. Singleton encountered Mr. Jenkins and Mr. Clark, and a fight ensued, Singleton versus Jenkins and Garvin versus Clark.   [R5-112]   Mr. Allen then joined the fight.  [R5-113]  Mr. Garvin lost track of Mr. Jenkins while the three Singleton brothers turned their attention to fighting Mr. Clark. [R5-113]  A gunshot fired in the air quickly changed the dynamic, and then Mr. Garvin beat a hasty retreat because he saw a guy named Lenkey, who is Albert Myles' other brother, coming towards him.  [R5-117-118]  Mr. Garvin left not only his brother Carlos and his brother Jamie, but also his coat, keys, and one of his shoes in the Chaos parking lot. [R5-118]  He got in a friend's car - a friend whose name he could not remember by the time of the trial - and went to his father's house. [R5-118]

After the defense rested, counsel renewed his motion for judgment of acquittal.   The court denied the motion.  [R5-159-160]

Id. at 1-16 (footnotes omitted).

On October 4, 2002, the Fifth District Court of Appeal affirmed Petitioner's judgment of conviction in a written opinion, which states, in pertinent part, the following:

The conviction for manslaughter is affirmed. In moving for a judgment of acquittal, a defendant admits the facts stated and evidence adduced, and also every conclusion favorable to the state that a jury might reasonably infer from the evidence. Hardwick v. State, 630 So.2d 1212, 1213 (Fla. 5th DCA 1994).  A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence.  State v. Law, 559

So.2d 187, 188 (Fla. 1989).  Where the only
proof of guilt is circumstantial, no matter
how strongly the evidence may suggest guilt, a
conviction cannot be sustained unless the
evidence is inconsistent with any reasonable
hypothesis of innocence.  <u>Id.</u>  Here, the
evidence that was inconsistent with the
defendant's theory of innocence was that he
was the only one of the six participants in
the brawl who was seen with a knife, he made
lunging motions toward the victim while
fighting with him, and he thereafter turned
and stabbed another victim upon the latter's
approach.

<u>Myles v. State</u>, 826 So.2d 1102, 1102-03 (Fla. 5th DCA 2002); App.

G.  The mandate issued on October 23, 2002.  App. H.

On December 12, 2003, Petitioner, through counsel (James T.

Miller, Esquire), filed a motion for post-conviction relief

pursuant to Fla. R. Crim. P. 3.850 (hereinafter Rule 3.850 motion).

App. I at 1-11.  Thereafter, he filed amendments to the Rule 3.850

motion.  <u>Id</u>. at 16-21.  In the Rule 3.850 motion, as amended,

Petitioner presented the same ineffective assistance of counsel

claims that are raised in the Petition before this Court.  After

conducting an evidentiary hearing, the trial court entered an order

denying the Rule 3.850 motion, as amended.  <u>Id</u>. at 50-55.

Petitioner appealed, and on November 22, 2005, the Fifth

District Court of Appeal per curiam affirmed the trial court's

order, without issuing a written opinion.  App. at M.  Petitioner

filed a motion for rehearing and clarification, which was denied on

December 22, 2005.  App. N; App. O.  The mandate issued on January

9, 2006.  App. P.

14

On October 21, 2001, Petitioner filed a petition for writ of habeas corpus in the Fifth District Court of Appeal, alleging that appellate counsel was ineffective for failing to argue that the evidence that Petitioner stabbed another person (Jamie Allen) was inadmissible.  App. Q.  The court denied the petition on March 1, 2005.  App. S.

Respondents concede that this case was timely filed within the one-year limitation period for filing federal habeas corpus petitions.  Response at 11.  This Court agrees.

### III.  Evidentiary Hearing

This Court has carefully reviewed the record and concludes an evidentiary hearing is not necessary.[5]  A habeas corpus petitioner is entitled to an evidentiary hearing in federal court if he alleges facts which, if proven, would entitle him to habeas corpus relief.  Smith v. Singletary, 170 F.3d 1051, 1053-54 (11th Cir. 1999) (citation omitted).  Here, the pertinent facts of the case are fully developed in the record before the Court.  The Court can "adequately assess [Petitioner's] claim[s] without further factual development."  Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), cert. denied, 541 U.S. 1034 (2004).  Therefore, an evidentiary hearing will not be conducted by this Court.

---

[5] Petitioner concedes "that an evidentiary hearing is not necessary in this case."  Reply at 1.

## IV.  Standard of Review

On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (hereinafter AEDPA).  Since this action was filed after the effective date of AEDPA, the Court will analyze Petitioner's claim under 28 U.S.C. § 2254(d), as amended by AEDPA.

> The Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this [action] and limits our review of the decisions of the state courts:
>
> > A federal court may not grant a petition for a writ of habeas corpus to a state prisoner on any claim that has been adjudicated on the merits in state court unless the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state court.
>
> Clark v. Crosby, 335 F.3d 1303, 1307-08 (11th Cir. 2003) (citations omitted). . . .

Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir.), cert. denied, 546 U.S. 1064 (2005).  Furthermore, AEDPA also directs that a presumption of correctness be afforded to factual findings of state courts, which may be rebutted only by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).

Finally, for a state court's resolution of a claim to be an adjudication on the merits, so that the state court's determination

16

will be entitled to deference for purposes of federal habeas corpus review under AEDPA, all that is required is a rejection of the claim on the merits, not an opinion that explains the state court's rationale for such a ruling.  <u>Wright v. Sec'y for the Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002), <u>cert</u>. <u>denied</u>, 538 U.S. 906 (2003).  Thus, to the extent that Petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under the new § 2254(d).

### V. Findings of Fact and Conclusions of Law

### A. Procedural Bar

Respondents assert, and Petitioner concedes, that portions of ground three are procedurally barred because they were not exhausted.  Response at 13-16; Reply at 1-2.  In ground three, Petitioner contends that counsel was ineffective for failing to call Brian Passmore, Erica Bradshaw and Katrina Brown as witnesses in his defense.  This claim was raised as ground D in the amendment to his Rule 3.850 motion.  However, on appeal of the order denying the application for post-conviction relief, appellate counsel failed to argue that the trial court erred in denying this claim.  Nevertheless, in the appeal of the order denying the motion for post-conviction relief, appellate counsel did argue that the trial court erred by failing to address whether Katrina Brown's testimony could have been used to impeach Addie Hodges' testimony.  Thus, Petitioner's claims in ground three are exhausted only to the

17

extent that he claims that counsel was ineffective for failing to call Katrina Brown as a witness because Katrina Brown's testimony could have been used to impeach Addie Hodges' testimony.   The remainder of ground three has not been exhausted.

A petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state remedies.   See Castille v. Peoples, 489 U.S. 346, 349, reh'g denied, 490 U.S. 1076 (1989); Rose v. Lundy, 455 U.S. 509 (1982).   "In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." Turner, 339 F.3d at 1281 (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999)). "This exhaustion doctrine 'is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts.'" Turner, 339 F.3d at 1281 (quoting O'Sullivan, 526 U.S. at 845).

It would be futile to dismiss this case to give Petitioner the opportunity to exhaust the remainder of his claims under ground three because they could have and should have been raised on appeal of the order denying the motion for post-conviction relief. Accordingly, Petitioner's claims in grounds three, with the exception of his claim that counsel was ineffective for failing to call Katrina Brown as a witness because Katrina Brown's testimony

could have been used to impeach Addie Hodges' testimony, have been procedurally defaulted.

"Procedural defaults in state courts will foreclose federal court review, absent a showing of cause and prejudice." Parker v. Sec'y for the Dep't of Corr., 331 F.3d 764, 770 (11th Cir. 2003) (citing Wainwright v. Sykes, 433 U.S. 72 (1977)), cert. denied, 540 U.S. 1222 (2004).   "[A] federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to correct a fundamental miscarriage of justice." Fortenberry v. Haley, 297 F.3d 1213, 1222 (11th Cir. 2002) (per curiam) (citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986)), cert. denied, 538 U.S. 947 (2003).   The fundamental miscarriage of justice exception is only available in extraordinary cases upon a showing of "'actual' innocence" rather than mere "'legal' innocence." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted), cert. denied, 535 U.S. 926 (2002).

Petitioner has not shown both cause excusing the default and actual prejudice resulting from the bar.   Furthermore, he has not shown that he is entitled to the fundamental miscarriage of justice exception.   Thus, the Court need not address Petitioner's procedurally barred claims in ground three.

## B. Merits

As noted previously, Petitioner presents three ineffective assistance of counsel claims in his Petition.   "The Sixth Amendment

19

guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citations omitted). The Eleventh Circuit captured the essence of an ineffectiveness claim:

> [A] petitioner must show that his lawyer's performance fell below an "objective standard of reasonableness" and that the lawyer's deficient performance prejudiced the petitioner. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Establishing these two elements is not easy:  "the cases in which habeas petitioners can properly prevail on the ground of ineffective assistance of counsel are few and far between." Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (quoting Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)).

> For assessing a lawyer's performance, Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000) (en banc) cert. denied, 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001), sets out the basic law: "Courts must indulge the strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." Id. at 1314 (internal marks omitted). . . . Our role in reviewing an ineffective assistance claim is not to "grade" a lawyer's performance; instead, we determine only whether a lawyer's performance was within "the wide range of professionally competent assistance." See Strickland, 104 S.Ct. at 2066.

> The inquiry into whether a lawyer has provided effective assistance is an objective one:  a petitioner must establish that no objectively competent lawyer would have taken

the action that his lawyer did take."   <u>See</u>
<u>Chandler</u>, 218 F.3d at 1315. . . .

        A petitioner's burden of establishing
that his lawyer's deficient performance
prejudiced his case is also high.  "It is not
enough for the [petitioner] to show that the
errors had some conceivable effect on the
outcome of the proceeding.  Virtually every
act or omission of counsel would meet that
test."   <u>Strickland</u>, 104 S.Ct. at 2067.
Instead, a petitioner must establish that a
reasonable probability exists that the outcome
of the case would have been different if his
lawyer had given adequate assistance.  <u>See</u> <u>id</u>.
at 2068.

<u>Van Poyck v. Florida Dep't of Corr.</u>, 290 F.3d 1318, 1322-23 (11th

Cir. 2002) (per curiam) (footnotes omitted), <u>cert</u>. <u>denied</u>, 537 U.S.

812 (2002), 537 U.S. 1105 (2003).

    In sum, "[w]ithout proof of both deficient performance and

prejudice to the defense, . . . it could not be said that the

sentence or conviction 'resulted from a breakdown in the adversary

process that rendered the result of the proceeding unreliable,' and

the sentence or conviction should stand."   <u>Bell v. Cone</u>, 535 U.S.

685, 695 (2002) (internal citation omitted) (quoting <u>Strickland v.</u>

<u>Washington</u>, 466 U.S. 668, 687 (1984)).

    In ground one, Petitioner contends that he received

ineffective assistance of counsel for counsel's failure to cross-

examine and produce evidence of bias of the state witnesses against

the Petitioner.  In support of this claim, Petitioner incorporates

the argument he raised in ground two of his Rule 3.850 motion,

which is as follows:

                              21

A.   Failure to elicit information about a fight between the Singleton family and Defendant.

Defense counsel for Defendant noted in his opening statement that there was bad blood between the Singleton clan and the Myles clan - it stemmed from something that had happened a few weeks earlier at Thanksgiving. However, counsel did not elicit **any** information about the bad blood. Defendant advised counsel that on Thanksgiving night Defendant and his fiancee (Roselyn Singleton) had a fight. Members of the Singleton family jumped on Defendant. Defendant and Roselyn Singleton could have testified to these facts.

The next day, the victim, Carlos Singleton and his two brothers Ronald Garvin, Jamie Allen and Rodney Singleton came to Defendant's home to fight Defendant. Roselyn Singleton called 911 about the incident. Deputy Sheriff Gary Bowling came to Defendant's home. Ronald Garvin told Defendant that he "would get you now." Defendant advised defense counsel about this incident. Despite this knowledge, defense counsel did not elicit any information at trial about the incident. Counsel did not cross-examine Garvin and Allen about the incident. Garvin and Allen testified at trial against Defendant. Counsel knew this information from deposition testimony.

Defense counsel did not establish at trial that the state's witnesses had allegiances to the Singleton family. Counsel did not elicit information that Travia Fuller was dating and expecting a child with Clarence Hughes, a cousin of the Singleton[s]; Fuller's cousin had a child with Ronald Garvin. Defendant and his family advised counsel of this information. Defendant or Roselyn Singleton were available to testify about this information. Counsel also knew this information from deposition testimony (of Ronald Garvin). Counsel also knew that Gregory Dante Willis's cousin dated Jamie

Allen (who testified against Defendant), the
first cousin of Dante Willis (who testified
against Defendant). Counsel had this
information but did not use it at Defendant's
trial. The failure to raise the above-
described information prejudiced Defendant.
The issue in this case was whether Defendant
stabbed the victim. The alleged eyewitnesses
to the stabbing had significant bias against
Defendant. If counsel had elicited this
evidence of bias, then the jury could have
disbelieved the state's witnesses.

B.    <u>Failure to elicit information about an
      earlier fight between Defendant and the
      Singleton[s] on the night in question</u>.

Defendant advised counsel that earlier on
the night in question[,] the victim's cousin
(Clarence Hughes) bumped into Defendant at a
club. At first, he gave Defendant a unit
(negative bok [sic]), then bumped into
Defendant, and sat behind Defendant staring at
him as if he was attempting to provoke
Defendant. He went outside with Jamie Allen
and other guys with them and as the Defendant
passed by them, they began to pull out in an
effort to antagonize Defendant. Defendant's
nephew and little brother were with him.
Defendant told counsel that the Singleton
family had a beef (hatred) for Defendant based
upon this incident and past problems between
Defendant and the Singletons. Defendant
advised counsel that he told the police (who
interviewed [him] about the killing of the
victim in this case) about the prior incident.
Counsel did not question the police officers
at trial about Defendant's statements about
the earlier incident. Counsel did not
question the state's witnesses about the
earlier incident. Counsel's failure to
question about the matters described above
prejudiced Defendant. Counsel utterly failed
to establish the significant bias between the
victim's family or friends and Defendant. The
victim's family or friends testified against
Defendant. In light of the prior problems at
the brawl on the night in question, the

victim[']s family and friends had a
significant reason to pin the murder on
Defendant.  Counsel failed to establish this
motive to lie.  If counsel had properly
established this motive, then there is a
reasonable probability that the jury would
have discredited the state's testimony.

App. I at 6-9.

As noted previously, Petitioner raised this claim as ground

two in his Rule 3.850 motion.  After identifying <u>Strickland</u> as the

controlling legal authority, the trial court adjudicated the claim

as follows:

<u>Ground Two - A - Failure to elicit
information about a fight between the
Singleton family and the Defendant.</u>

In ground two-A, the Defendant argues
that trial counsel was ineffective for raising
the issue of a feud between the Defendant and
the victim[']s family.  The Defendant claims
that by raising the issue of the feud in
opening arguments, and then failing to present
evidence of three previous fights between the
victim[']s family and the Defendant's family,
[counsel] was ineffective.

The Court heard testimony of trial
counsel that he had to balance the amount of
information given to the jury on the issue of
"bad blood" between the families of the
Defendant and victim.  Too much information,
or a focus on this issue, may have caused the
jury to believe that Defendant was guilty of
the crime.  The record reflects three times
that trial counsel raised the issue of
possible bias in the trial.  See Trial
Transcript, Volume I, pages 24-35, attached as
**appendix A**; Trial Transcript Volume III, pages
113-117, **attached as appendix B**; Trial
Transcript Volume III, page 77 attached as
**appendix C**.

The Court, having heard the testimony of trial counsel, finds that this issue is a of [sic] trial strategy.  See Hamilton v. State, 860 So.2d 1028 (Fla. 5th DCA 2003).  Trial counsel must be given broad deference concerning issues of trial strategy.  Id.

Ground Two - B - Failure to elicit information about an earlier fight between Defendant and the Singletons on the night in question by failing to call witnesses.

In ground two-B, the Defendant claims that trial counsel was ineffective for failing to establish information regarding an earlier fight.  For the same factual and legal reasons in ground two-A, this claim is denied.

App. I at 52-53.

The trial court's decision was affirmed on appeal.  Thus, there are qualifying state court decisions from both the state trial and appellate courts.  The Court must next consider the "contrary to" and "unreasonable application" components of the statute.  "It is the objective reasonableness, not the correctness per se, of the state court decision that we are to decide."  Brown v. Head, 272 F.3d 1308, 1313 (11th Cir. 2001), cert. denied, 537 U.S. 978 (2002).

The record supports the trial court's findings.  At trial, defense counsel (Donald E. Holmes, Esquire) said during his opening statement that there was "bad blood" between the Singleton family and the Myles family.  Vol. I[6] at 33.  He stated that the "bad

---

[6] App. B is the trial transcript, which consists of four volumes.  The Court will hereinafter refer to these volumes as "Vol. I," "Vol. II," "Vol. III" and "Vol. IV."

blood" was the result of a fight between various members of the two families a few weeks earlier at Thanksgiving.  Id.  During the trial, Mr. Holmes asked Ronald Garvin about the fight between members of the two families on Christmas night.  Then, the following colloquy ensued:

> Q    Didn't you tell me you were--strike that. There had been some problems in the past between your family and the Myles family, hadn't there?
>
> A    I wouldn't say like between our families.
>
> Q    All right.  Between you and Bay Bay and Amp?
>
> A    Yeah.  We got into a fight Thanksgiving, yes, sir.
>
> Q    And when you and Carlos ran into Freddie and Jenkins (sic), you think they said something to you or you think Amp pushed your brother, right?
>
> A    He pushed my brother.
>
> Q    And then when Amp pushed your brother, you hit Amp?
>
> A    Yeah, because he came to me and said, "What's up," so I hit him.
>
> Q    And once Freddie got out of the picture and the fight started, all of those emotions, all those feelings from the Thanksgiving incidents and everything else, they kind of boiled over, right?
>
> A    I don't know what you mean by that.
>
> Q    Well, weren't you--when you saw Amp push Carlos, didn't you at that point feel that they weren't gonna let you all alone?

A    Yes, sir.

Q    And because they weren't gonna let you all alone, your emotions--your feelings were just so that you all thought you were gonna give it to them?

A    No.  We were just gonna fight them.  They were bullies all their life.

Q    Okay.  Do you remember me taking your deposition and asking you some questions, under oath, back on April 3rd of 2001?

A    Yes.

Q    On Page 46 at line 13--well, 10, for context, do you remember me asking these questions and you giving me these answers?

    "Question:  So Freddie's out of the picture and now it's you, Carlos, and Jamie on--"

    Your answer:  "On Amp."

    My question:  "On Amp?  Okay.  You all were beating him up pretty good?"

    "Answer:  Of course.  I mean, not--I don't know.  How can I say it?  When, what I'm saying is, the emotion from Thanksgiving, and we don't--we didn't pursue them after this, and then for them to come and just--you know, for him to push my brother, it was like, when is it gonna end?"

    "Question:  Okay.  He just kind of tripped the switch?"

    "Answer:  Yeah.  I mean, because we-- after that second day after, after we went to Bay Bay's house, we just say we weren't gonna pursue it no more.  We say, I saw Amp, and I saw Bay Bay after that, and even that night, at John L's--" and you go on through some more.

27

And then at Line 13, "Question: So enough is enough?"

"Answer:  Yeah."

Do you remember telling me that?

A     Yes.

Vol. III at 113-16.

Additionally, during the cross-examination of Addie Pearl Hodges, Mr. Holmes elicited the following testimony regarding her possible bias due to her affiliation with the Singleton family and animosity towards the Myles family.

Q     Now it's my understanding that you went, you said to Mr. Vest, with Bay Bay's nephew for about five years?

A     Uh-huh.

Q     You have a baby by him, right?

A     Yes.

Q     But you and the Myles family don't get along any more?

A     Yes, you could say that.

Q     Well, you told me that, didn't you?

A     Yes.

Q     And it has to do with child support issues, your baby, and those kinds of things?

A     Yes.

Q     As a matter of fact, within two weeks--well, Bay Bay's nephew has gone to jail at least once over child support issues, hasn't he?

> A    That was just last month.
>
> Q    Last month?  And your sister has a baby by Panda, doesn't she?
>
> A    Yes.

Id. at 77.

As noted by the trial court, Mr. Homes testified at the evidentiary hearing regarding this issue.  The pertinent portion of his testimony is as follows:

> Q[7]  Okay.  At this time I'm going to move on to Ground 2 of the Defendant's original motion for post-conviction relief, and that is the fact that there was bad blood between your client's family and the Singleton family.
>
> A    Uh-huh.
>
> Q    As a matter of trial strategy, is -- and as Albert Myles' defense attorney, is that something that you felt should have been focused upon during the trial?
>
> A    As I told the other representative from the State, it's an issue that you may have to address, and I think it was touched upon in trial, but you have to be careful about how you address it because if you focus too much on that bad blood, as it is described, you may also be giving the jury an idea as to why my client had a motive to kill the victim as alleged in the Information.  So it's something you have to handle somewhat carefully, in my opinion.
>
> Q    So it's fair to say as a matter of trial strategy for you, it was a concern of

---

[7] Assistant State Attorney Robin Strickler represented the state at the evidentiary hearing and questioned Mr. Holmes regarding this matter.

yours not to make a point of bringing out the
bad blood between the two families?

A     Well, to the extent that, quote, bad
blood might influence the testimony of a
witness, it was adverse to me, and if I had
something to hang my hat on in suggesting that
that bad blood might be coloring their
testimony, maybe it would be a fair topic for
impeachment.

But you have to remember that to sell
that argument too far, you're going to have to
sell a jury on the fact that the blood was so
bad that they'd rather see Albert Myles
convicted of murder than the person who really
did it.  And that's -- that's -- that's quite
a leap.

So if there was an entry, if that gave me
an entry to work with a witness and
impeachment, then so be it, I'm sure I would
have used it to the extent that I would.

But as far as basing my whole trial
theory on this bad blood argument, it can cut
both ways.  I build that bad blood too much, I
build it up too much, and then I explain to a
jury why my guy would have killed someone that
he could have just been in a fistfight with
instead of using a weapon.

App. I at 188-90.

In adjudicating this claim, the state court made a finding
that Mr. Holmes limited the amount of testimony about the "bad
blood" between the two families as a matter of trial strategy.
This is a finding of fact, which is presumed correct, absent clear
and convincing evidence to the contrary.  See Dingle v. Sec'y for
the Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007) (holding
that the state court's finding that defense counsel made a tactical

30

decision is a finding of fact, and a state court's decision as to this issue is therefore presumed to be correct, absent convincing evidence to the contrary).

> Moreover, "[c]ounsel will not be deemed unconstitutionally deficient because of tactical decisions." McNeal v. Wainwright, 722 F.2d 674, 676 (11th Cir. 1984) (citations omitted); Crawford, 311 F.3d at 1312 ("Deliberate choices of trial strategy and tactics are within the province of trial counsel after consultation with his client. In this regard, this court will not substitute its judgment for that of trial counsel." (quotation marks, internal alteration, and citation omitted)). There is a strong presumption that counsel's performance was reasonable and adequate, with great deference being shown to choices dictated by reasonable strategy. Rogers, 13 F.3d at 386; see also Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004), cert. denied, 544 U.S. 952, 125 S.Ct. 1703, 161 L.Ed.2d 531 (2005). "The presumption of reasonableness is even stronger when we are reviewing the performance of an experienced trial counsel."[8] Callahan v. Campbell, 427 F.3d 897, 933 (11th Cir. 2005).

Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005), cert. denied, 126 S.Ct. 2025 (2006).

In this case, it is clear that Mr. Holmes made a reasonable tactical decision to limit his presentation of evidence of the animosity between the two families to impeachment of the testimony of these witnesses affiliated with the Singleton family or

---

[8] Mr. Holmes became an attorney in 1976. He testified that he prosecuted approximately 140 jury trials when he was employed with the State Attorney's Office from 1976 to 1983. From 1983 through the date of the evidentiary hearing, he participated in an average of three jury trials per year. See App. I at 184-85.

estranged from the Myles family.  The decision to not present more testimony regarding the "bad blood" between the two families was reasonable because too much of this evidence could have led the jury to believe that Petitioner had a motive to kill the victim. In sum, counsel's tactical decision was objectively reasonable. Thus, his performance in this regard was not deficient.

Accordingly, for the forgoing reasons, it is clear that the state courts' adjudications of this claim were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Thus, Petitioner is not entitled to relief on the basis of this claim.

In ground two, Petitioner contends that he received ineffective assistance of counsel for counsel's failure to impeach state witness Addie Hodges.  In support of this claim, Petitioner incorporates the argument he raised in grounds B and C in the amendment to his Rule 3.850 motion, which is as follows:

> B.   Trial counsel failed to impeach Addie Hodges' testimony - she testified that when someone shouted "Police", all the persons present, including Defendant ran away.
>
> Trial counsel failed to impeach Addie Hodges' statement with the security videotape of the parking lot which showed that no one ran away.  Defendant and the others simply walked away.  As to this issue, Defendant adopts and incorporates his legal arguments in

the 3.850 motion as to the prejudicial effect
of counsel's failure pursuant to <u>Strickland v.
Washington</u>, supra.

C. <u>Trial counsel failed to impeach Addie
Hodges' testimony based upon her
deposition testimony</u>.

In deposition, and in a statement to the
police, Addie Hodges testified she did not see
any of the alleged incident.  At trial, she
testified differently.  (See Statement of
facts in the 3.850 motion)  Counsel failed to
impeach her with her prior deposition
testimony and her prior statements to the
police.  Defendant adopts and incorporates by
reference his arguments in the 3.850 motion as
to the prejudice from counsel's failure to
impeach this witness.

App. I at 17-18.

As noted above, Petitioner raised his claims in ground two of

the Petition as grounds B and C in his Rule 3.850 motion, and the

trial court adjudicated the claims as follows:

<u>Amended Ground B - Failure to impeach
Addie Hodges['] testimony</u>.

In amended ground B, the Defendant claims
that trial counsel was ineffective for failing
to impeach Addie Hodges with a video from a
fixed-mount camera inside the car of the first
responding officer.  Hodges testified at trial
that people "ran away."  The police video
shows people walking away.

However, at the hearing on this issue, it
was determined that Ms. Hodges was referring
to an earlier incident when she stated that
people "ran away."  As such, she was not
subject to impeachment, and this ground is
denied.

<u>Amended Ground C - Failure to impeach
Addie Hodges['] testimony</u>.

33

> In amended ground C, the Defendant claims
> that trial counsel was ineffective for failing
> to impeach Addie Hodges with her previous
> deposition.   In reviewing the deposition of
> Addie Hodges, and the trial testimony in this
> cause, the Court finds that trial counsel
> impeached Ms. Hodges to the best of his
> ability.   See Deposition of Addie Pearl
> Hodges, pages 43-48 attached as **appendix E**;
> Trial Transcript, Volume III, pages 76-77
> attached as **appendix F.**

Id. at 53-54.

The trial court's decision was affirmed on appeal.  Thus, there are qualifying state court decisions from both the state trial and appellate courts.  Again, the trial court's denial of this claim is supported by the record.

At trial, Addie Hodges testified that around 1:00 a.m. or 2:00 a.m. on December 26, 1999, she observed a fight outside of Club Chaos.  Vol. III at 46-49.  She saw three individuals (Carlos Singleton, Ronald Garvin and Jamie Allen) fighting against Anthony Clark.  Id. at 50.  She heard someone say, "Go get Bay Bay" (Albert Myles).  Id. at 51.  Then, she observed Albert Myles running towards the men who were fighting and saw that he was "fixing to starting [sic] swinging." Id. at 53.  At this point, she heard gunshots and ran away to hide beside a car.  Id. at 53.

A short while later, she came out of her hiding spot and saw Anthony Clark and Albert Myles "kicking and stomping Carlos." Id. at 54.  Then, she saw Jamie Allen arrive on the scene with a brick in his hand.  Id. at 55.  The Petitioner and Anthony Clark rushed

34

towards Jamie Allen, and then she saw the Petitioner stab Jamie Allen. Id. at 56. A few seconds later, she heard someone yell, "The police is coming" and then "they took off running." Id. at 57. On cross-examination, she clarified that "Bay Bay and Amp took off running" at this point. Id. at 74. She testified that the police arrived on the scene a few seconds later. Id. at 75.

On cross-examination, Ms. Hodges admitted that she lied to Officer Willie Jones (one of the first police officers to respond to the scene) by stating that she had not seen anything. Id. at 76-77. She also admitted that she did not get along with the Myles family due to "child support issues" concerning the baby she had with the Petitioner's nephew. Id. at 77. Defense counsel also brought out the fact that Ms. Hodges' sister had a baby with Ronald Garvin (Panda). Id.

In her deposition, Ms. Hodges also admitted that she initially lied to Officer Jones. App. I at 79. The next day, she decided to tell the police what she had seen. Id. at 46. Her rendition of the relevant events in the deposition mirrors her trial testimony. Id. at 44-45.

Turning to Petitioner's first claim in this ground--defense counsel's failure to impeach Addie Hodges' statement with the security videotape of the parking lot which showed that no one ran away and that the Petitioner and the others simply walked away--the Court finds this claim to be unavailing. At the evidentiary

35

hearing, Mr. Miller admitted that he erred in alleging that there was a security tape and that there was in fact only one tape, the videotape that was taken from the police car of Lieutenant Harper, an officer who arrived on the scene after the fight ended.  Id. at 232, 237.  As noted by the state at the evidentiary hearing in state court:

> Addie Hodges testified as to what she saw before Lieutenant Harper arrived on the scene.
>
> Now, Judge, Lieutenant Harper is the law enforcement officer that had the in-car video, had the camera and had the tape on scene, which I believe the tape has been entered into evidence.  She testified what she saw before, that she saw people running, prior to anything being recorded to his in-car camera.
>
> Now, if she saw -- if she testified that she saw people running, and this is before Lieutenant Harper showed up, well, then that's consistent.  Had she testified that she saw people running and the video showed that they were walking, that would also be consistent because she never stated that she saw anybody running after Lieutenant Harper arrived on scene.

Id. at 231-32.

This Court agrees that this impeachment would not have been effective because Addie Hodges testified about events that occurred before any police officers arrived at the scene, and the video-tape depicts what happened after the police arrived on the scene. Clearly, defense counsel's performance was not deficient and Petitioner was not prejudiced by counsel's failure to impeach Ms. Hodges' testimony with this videotape.

Additionally, even though defense counsel did not cross-examine Ms. Hodges on this issue, he did bring out the point in his closing argument.  During closing argument, defense counsel stated the following, "How did my client leave the scene?  Everyone agreed he was running.  Think about it.  Addie Fuller, 'running.'  Well, the State gave you a videotape.  Did you see him running?"  Vol. IV at 64-65.   Clearly, discrediting Ms. Hodges' testimony by highlighting this discrepancy during closing argument was more effective than attempting to impeach her with the videotape evidence during cross-examination since she may very well have had an explanation for the discrepancy (such as the Petitioner initially ran from the scene, but began to walk when the police cars arrived in the area).  In sum, counsel was not ineffective for failing to impeach Ms. Hodges' testimony with the videotape evidence during the cross-examination of Ms. Hodges.

Defendants second claim under this ground--that trial counsel was ineffective for failing to impeach Addie Hodges with her previous deposition--is likewise without merit.   As stated previously, her deposition testimony regarding the events in question mirrored her testimony at trial.  As noted by the trial court, defense counsel impeached Ms. Hodges to the best of his ability.  He brought out the fact that she initially lied to the police and that she and the Myles family were estranged.

37

Thus, for the forgoing reasons, it is clear that the state courts' adjudications of these claims were not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Petitioner is not entitled to relief on the basis of his claims in ground two.

In ground three, Petitioner alleges that counsel was ineffective for failing to call witnesses on Petitioner's behalf at trial. In support of this claim, Petitioner incorporates the argument he raised in ground D in the amendment to his Rule 3.850 motion, which is as follows:

> D.   Trial counsel failed to call witnesses on behalf of Defendant.
>
> Before trial, Defendant advised counsel that he wished to call Brian Passmore, Katrina Brown and Erika Bradshaw as witnesses. These witnesses were available to testify. They were at the courthouse during Defendant's trial but counsel did not call them. Defendant advised counsel that they were in the parking lot at the time of the incident. They would have testified that although Defendant was in the fight, he did **not** have a knife. Counsel refused to call these witnesses. The prejudice from the failure to call these witnesses is obvious. If Defendant did **not** have a knife, he could not have stabbed the victim. These witnesses could have directly contradicted the state's witnesses. Defendant told counsel about these witnesses and the substance of their testimony. However, counsel refused to call

> these witnesses.    These witnesses are
> currently available to testify.  Defendant has
> alleged a prima facie case of ineffective
> assistance of counsel.  See Schopper v. State,
> 790 So.2d 471 (Fla. 5th DCA 2001); Hatten v.
> State, 698 So.2d 899 (Fla. 5th DCA 1997).

App. I at 18.

As stated previously, the Court will review only the portion

of this ground that was exhausted in state court (that counsel was

ineffective for failing to call Katrina Brown as a witness because

Katrina Brown's testimony could have been used to impeach Addie

Hodges' testimony).   The trial court adjudicated ground D in the

amendment to Petitioner's Rule 3.850 motion as follows:

> Amended Ground D- Trial counsel failed to
> call witnesses on behalf on the Defendant.
>
> In ground C, the Defendant testified at
> the evidentiary hearing that Brian Passmore,
> Erica Bradshaw, and Katrina Brown were present
> at the incident and could have testified as to
> what they saw on the night of the incident and
> previous fights.  The Defendant testified that
> he instructed trial counsel to call these
> witnesses, and expected him to do so.
>
> Trial counsel testified that he had no
> recollection of the Defendant asking him to
> call any witness.[9]   Further, trial counsel
> testified that he interviewed Ms. Passmore and
> Ms. Brown and found their testimony
> conflicting.  Further, Mr. Passmore testified
> at the hearing that although he did not see

---

[9] Specifically, Mr. Holmes testified, "I don't recall Albert
Myles ever asking me to call anybody.  I recall us talking about
the possibilities of calling several people.  But I don't recall
him saying, I want you to call Brian Passmore or Katrina Turner, or
Brown, as you refer to her in your motion, or anybody else."  App.
I at 210.

the Defendant with a knife, he could not rule
out the possibility.   Mr. Passmore and Ms.
Brown also refused to give written statements
to the police after making verbal statements.
Ms. Bradshaw gave a statement to the police in
which she stated that she saw nothing.
Finally, Mr. Passmore had on one previous
indication [sic] implicated the Defendant in
the crime.

Based on these facts adduced at the
evidentiary hearing on this issue, the Court
finds that the Defendant did not instruct
trial counsel to call the witness.   Trial
counsel testified that he closely weighed the
pros and cons of calling the witness, and
decided against it.   This too is a matter of
trial strategy that can not be disturbed in
hindsight.   Id.

App. I at 54.

The trial court's decision was affirmed on appeal.   Thus,
there are qualifying state court decisions from both the state
trial and appellate courts.   Upon a thorough review of the record
and the applicable law, it is clear that the state courts'
adjudications of this claim were not contrary to clearly
established federal law, did not involve an unreasonable
application of clearly established federal law, and were not based
on an unreasonable determination of the facts in light of the
evidence presented in the state court proceedings.   Thus,
Petitioner is not entitled to relief on the basis of this claim.

Accordingly, for the above-stated reasons, the Petition will
be denied, and this case will be dismissed with prejudice.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.    The Petition is **DENIED**, and this action is **DISMISSED WITH PREJUDICE.**

2.    The Clerk of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.    The Clerk of the Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this __25th__ day of October, 2007.

*Howell W. Melton*
HOWELL W. MELTON
United States District Judge

ps 10/10
c:
James T. Miller, Esquire
Assistant Attorney General Ann M. Phillips

41